UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                             :
UNITED STATES OF AMERICA,             :
                                             :           **Memorandum and Order**
                                             :
               -against-                      :           08-CR-310 (DLI)
                                             :
JOHN GOLOM,                                  :
                                             :
                                   Defendant.   :
                                             :
------------------------------------------------------------ x

**DORA L. IRIZARRY, United States District Judge:**

       John Golom ("the defendant"), who spent 119 days in federal custody before he was arraigned, moves to dismiss the indictment against him with prejudice. While the government acknowledges that dismissal for its violation of the Speedy Trial Act is warranted, it contends that dismissal should be without prejudice to reprosecution. After hearing the parties at oral argument and carefully considering the facts and circumstances of this case, the court grants the defendant's motion, in part, by dismissing the indictment and denies it, in part, as the dismissal of the indictment is without prejudice.

## BACKGROUND

       On February 26, 2003, the defendant was convicted of bank fraud and aiding and abetting thereof in violation of 18 U.S.C. §§ 1344 and 2, in the U.S. District Court for the Middle District of Pennsylvania. The court sentenced the defendant to twenty-one months of imprisonment and five years of supervised release. On August 12, 2004, the defendant was sentenced to another nine months of imprisonment and three months of supervised release after he violated the terms of supervised release on his original federal sentence. The defendant then violated the terms of

supervised release on this second federal sentence and was sentenced to another twelve months of imprisonment on March 16, 2006.[1]

Ten months into his third federal sentence of imprisonment, the Federal Bureau of Prisons ("BOP") granted the defendant a furlough to travel unsupervised by bus from Ray Brook Federal Corrections Institution to the Brooklyn Community Corrections Center ("Brooklyn CCC"), a half-way house, where he was ordered to serve the remaining sixty days of his sentence.[2] The defendant never reported to the Brooklyn CCC as expected. The next day, the BOP issued a notice of escape. (Gov't Ltr., July 11, 2008, Ex. E.) On March 2, 2007, a warrant was issued in this district for the defendant's arrest. (*Id*. at Ex. F.)

On May 15, 2007, the police arrested the defendant in Nassau County, New York, on extortion and harassment charges.[3] The defendant pled guilty to attempted grand larceny in the second degree (N.Y. Penal Law §§ 110 & 115.40) and aggravated harassment in the second degree (N.Y. Penal Law § 240.30), and was sentenced to eleven months of imprisonment in local custody. When the defendant completed this term of imprisonment at the Nassau County Correctional Facility in East Meadow, New York, on the evening December 20, 2007, the United States Marshals Service ("U.S. Marshals" or "Marshals") took him into federal custody pursuant

---

[1] The defendant violated Condition No. 2, which required him to report to the Probation Officer and submit a truthful and complete written report within the first five days of each month and a special condition, which required him to participate in counseling as directed by the Probation Officer. (*See* Judgment dated Mar. 16, 2006, attached as Ex. A to Gov't Letter, June 11, 2008.)

[2] On January 17, 2007, the defendant was placed on an Adirondack Trailways bus from Saranac Lake, New York to Albany, New York, with instructions to transfer to a Greyhound bus to New York City. Upon arrival in Manhattan, he was to report on his own to the Brooklyn CCC. (Aff. & Compl. in Supp. of Warrant for Arrest dated Mar. 2, attached as Ex. F to Gov't Ltr., July 11, 2008.)

[3] The Nassau County Police Department received complaints from a woman who felt threatened by the defendant. She agreed to arrange a meeting with the defendant at her home, where she and a third party would give money to the defendant. The meeting was under police surveillance and the defendant was arrested. (Report of Investigation by U.S. Marshals, attached as Ex. H to Gov't Ltr., July 11, 2008, at 3).

to two detainers and held him at the Queens Private Correctional Facility ("Queens facility"). The next day, Friday, December 21, 2007, the Marshals produced the defendant at this courthouse. The Marshals notified the magistrate arraignment clerks, but the defendant was not arraigned and was returned to the Queens facility. (Report of the U.S. Marshals, attached as Ex. H to Gov't Ltr., July 11, 2008.) James Gatta, the primary AUSA assigned to arraignment court duty that day does not recall receiving any information from the Marshals or the magistrate arraignment clerks regarding the defendant or hearing about a defendant taken into federal custody after having served a state sentence. (Aff. of James D. Gatta, attached as Ex. K to Gov't Ltr., July 11, 2008, at ¶¶ 4-6.) The cellblock log on that date shows "cancelled" written next to the defendant's name. (Prison Log dated December 21, 2008, attached as Ex. H to Gov't Ltr., July 11, 2008, at 10.) The defendant was not arraigned until April 16, 2008, some 119 days later.

Apparently, the defendant's case and incarceration went unnoticed by the U.S. Attorney's Office. As an internal investigation later revealed, Judith Philips, the Chief of Intake and Arraignments for the U.S. Attorney's Office, first received a telephone call from Deputy Marshal Frank Gonzalez just as the defendant was about to be taken into federal custody. AUSA Philips does not recall this telephone call, but wrote in her telephone log "escape M 07 290" on either December 19 or 20, 2007. (Aff. of Judith Philips dated July 11, 2008 ("Philips Aff."), attached as Ex. I to Gov't Ltr., July 11, 2008, at ¶ 9). During the morning of December 26, 2007, Deputy Marshal Gonzalez again called AUSA Philips about the defendant's case and left a voicemail message. That afternoon, AUSA Philips returned the call and asked for the warrant and complaint in the case, which the U.S. Marshals duly faxed over. (*See* U.S. Marshal's handwritten notes memorializing telephone communications and fax cover sheet dated December 26, 2007 from Deputy Marshal Gonzalez to AUSA Philips, attached as Ex. H to Gov't Ltr., July

3

11, 2008.) AUSA Philips has no independent recollection of the telephone calls, but her notes indicate "escapee picked up in Nassau Co. John Golom, 07 M 290." (Philips Aff., at ¶ 10.)

On January 7, 2008, Deputy Marshal Gonzalez faxed a brief note to AUSA Philips asking for a status report regarding the defendant and indicated that the U.S. Marshals were closing out 2007 cases. (*See* Fax from Deputy Marshal Gonzalez to AUSA Philips, dated Jan. 7, 2008, attached as Ex. I to Gov't Ltr., July 11, 2008.) AUSA Philips, who was on vacation from December 31, 2007 to January 14, 2008, recalls reviewing the fax upon her return to the office. She interpreted the U.S. Marshal's message as a request to dismiss the case. The fax did not indicate that the defendant was in custody and she was not aware of his incarceration. AUSA Philips retrieved and reviewed the case file, considered the case still active, and returned the file to the outstanding warrants folder. (Philips Aff., at ¶ 11). AUSA Philips believed that she subsequently left Deputy Marshal Gonzalez a voicemail conveying her position against dismissal of the complaint, but does not have notes to support that belief. AUSA Philips had no further correspondence on the case until she was contacted by Chief Judge Raymond J. Dearie four months later. At oral argument, the government indicated that there is usually staff coverage when the Chief of Intake is away from the office and that there was coverage during AUSA Philips' vacation in January 2008. However, apparently no one in the prosecutor's office reviewed the January 7 fax, and no further action was taken on the defendant's case.

On April 7, 2008, the defendant wrote a letter to Chief Judge Dearie seeking clarification of his status. The defendant explained that he had been held in a detention center in Jamaica, Queens, since December 21, 2007 "without any court appearance what so ever [sic], no arraignment no bail hearing / no court appointed counsel / no nothing (why?)" He pled for help: "Since I know nothing about the law, who do I turn too, [sic] If you could kindly assist me with

4

some valuable advice it would be greatly appreciated." Chief Judge Dearie notified AUSA Philips of the defendant's situation on April 14, 2008. After reviewing the defendant's letter, AUSA Philips retrieved the case file, which was stored in the outstanding arrest warrant files in the Intake unit, and issued a "475 request" to the U.S. Marshals to produce the defendant in arraignment court on April 16, 2008. (Philips Aff., at ¶ 5.) In light of the "atypical" circumstances surrounding the defendant's incarceration, AUSA Philips personally appeared at the defendant's arraignment that day, 119 days after his transfer from state custody. On May 12, 2008, 145 days after the U.S. Marshals took him into federal custody, the defendant was indicted on one count of flight from federal custody pursuant to 18 U.S.C. § 751(a).

A subsequent investigation undertaken by the U.S. Attorney's office at the direction of this court shed some light on the circumstances surrounding the defendant's case. First, the court inquired as to whether the Marshals obtained a custody order permitting them to hold the defendant after his release from the courthouse. The U.S. Attorney's office determined that the Marshals did not obtain a custody order because the defendant was already "in custody" pursuant to the judgment and sentence he was serving prior to his escape. (Gov't Ltr., Sept. 3, 2008, at 1.) Thus, when the defendant was not presented for arraignment before a magistrate judge on December 21, 2007, he was automatically remanded to the BOP. (*Id.*, at 2.) The court also inquired regarding the lodging documentation required by the Queens facility. The U.S. Attorney's office informed the court that "no documentation is required to lodge a defendant there (and accordingly no documentation exists)." (*Id.*) The court next inquired as to whether officials at the Queens facility asked the defendant about his next court appearance or whether the facility monitors defendants' cases to ensure that they are processed appropriately. Policy set by the Queens facility requires review of the status of every detainee, within 120 days of their

arrival, by personal interview. (*Id*. at 3.) In this case, Queens facility personnel met with the defendant on December 24, 2007 and March 10, 2008. (*Id*.) In December 2007, the defendant told Queens facility personnel that "the reason he [was] charge[d] [with] escape [was] because the bus was late so he was late to the halfway house." (*Id*., Ex. B.) In March 2008, the defendant told Queens facility personnel that he wanted "to know how long he will be in [the Queens facility] before they sent him to [the] MDC." (*Id*., Ex. B.) Queens facility Warden William D. Zerillo also stated via letter that, during an interview by a classifications officer, the defendant stated that he had no pending court dates. (*Id*., Ex. C.) Finally, the court sought clarification on how defendants produced to the courthouse are tracked. Generally, one of three magistrate clerks coordinates with both the Marshals and the U.S. Attorney's office to determine which defendants are scheduled to appear before the duty magistrate judge. (*Id*. at 4.) In this case, neither of the two magistrate clerks who worked on December 21, 2007, recalled being informed of the defendant's production on that date. (*Id*.)

## DISCUSSION

The Speedy Trial Act requires the government to charge "an individual with the commission of an offense" by filing an information or indictment "within thirty [(30)] days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). The time limits of the Speedy Trial Act begin to run automatically upon such an occurrence. *New York v. Hill*, 528 U.S. 110, 118 n.2 (2000). If no indictment or information is filed in within the time limit required, the charges against the defendant "shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). In this case, the violation of the Speedy Trial Act is clear: the government did not indict the defendant until 145

days after taking him into federal custody. The government agrees that dismissal is warranted, but argues that the case should be dismissed without prejudice to reprosecute.

In determining whether to dismiss a case with or without prejudice due to the government's violation of the Speedy Trial Act, the courts are instructed by statute to "consider, among other [factors]: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the Speedy Trial Act; and on the administration of Justice." 18 U.S.C. § 3162(a)(1). This determination is a matter within the court's discretion. *See United States v. Taylor*, 487 U.S. 326, 335 (1988). In addition to the factors explicitly cited in the Speedy Trial Act, courts also consider whether dismissal without prejudice would prejudice the defendant. *United States v. Gaskin*, 364 F.3d 438, 451 (2d Cir. 2004); *United States v. Upton*, 921 F. Supp. 100, 105 (E.D.N.Y. 1995) *aff'd United States v. Dragone*, 78 F.3d 65, 65 (2d Cir. 1996) (noting that the "impact of a reprosecution on the administration of the Speedy Trial Act and on the administration of justice, must, of necessity, also embrace the unexpressed factor of prejudice to the defendant"). The court addresses each of these considerations in turn.

### A. Seriousness of the Offense

The government emphasizes, and the court agrees, that the crime with which the defendant is charged, escaping federal custody, is a "serious" crime, which weighs in favor of dismissing the indictment without prejudice. A defendant who is convicted of escaping federal custody can face to up to five years' imprisonment under 18 U.S.C. § 751(a). Under the United States Sentencing Guidelines, 2P.1.1(a)(1), the offense of escape carries a Base Offense Level

("BOL") of 13.[4] That BOL, along with the defendant's Criminal History Category of V, yields a guidelines range of 30-37 months of imprisonment.

The defendant relies upon *United States v. Caparella*, in which the Second Circuit held that dismissal of a criminal complaint against the defendant occurring fifty-one days after his arrest should have been with prejudice to reprosecution, in part, because the defendant's alleged criminal conduct did not constitute a serious crime. 716 F.2d. 976, 980 (2d Cir. 1983). In that case, a postal worker was charged with stealing a ring from a mail package in violation of 18 U.S.C. § 1709, a felony that, like the offense in this case, is also punishable by up to five years' imprisonment. After the filing of the indictment was delayed solely due to the government's "careless inadvertence," the case was initially dismissed without prejudice and the defendant was reprosecuted and found guilty, after a bench trial, of the misdemeanor of opening mail without authority in violation of 18 § 1703(b). Among the reasons the Second Circuit gave for vacating the conviction and ordering dismissal of the case with prejudice was its finding that the defendant's conduct, though a breach of the public trust, could not be considered "a 'serious' crime, absent exacerbating circumstances such as violence . . . ." *Id.* at 980.

"Any felony charge is serious. But there are degrees of seriousness." *Mancuso v. United States*, 302 F. Supp. 2d 23, 26, n.1 (E.D.N.Y. 2004). The alleged criminal conduct in this case is considerably more serious than mail theft. The primary concern of law enforcement regarding the prevention of an inmate's act of escape is the public's safety. Here, the defendant's behavior while "on the lam" highlights why that is such a grave concern. While the defendant is alleged to have escaped unsecured federal custody without committing any overt violent acts, he resorted

---

[4] The defendant is not eligible for a BOL reduction of four levels for having fled non-secured custody because he committed a local offense punishable by a term of one year or more during the period in which he was a federal escapee. U.S.S.G. § 2P.1.1(b).

8

to criminal conduct while a fugitive. The defense describes the defendant as "a large man" who "will lose his temper and scream," but denies that the defendant had made any threats of physical violence while committing extortion and harassment in Nassau County. (Transcript of Oral Argument, July 25, 2008, at 7). Regardless of whether the defendant's violent threats were delivered in physical or verbal form, the fact remains that he committed the crimes of extortion and harassment while he was a federal escapee, causing a citizen to be placed in fear. As such, the court is greatly troubled by the defendant's repeated disregard for the law, and finds his escape conduct to be a serious crime. Therefore, the seriousness of the offense charged weighs significantly in favor of dismissal without prejudice.

**B. Facts and Circumstances Leading to the Violation of the Speedy Trial Act**

The government also asserts that, as there is no evidence of bad faith or a pattern of neglect by the local U.S. Attorney's office, the case should be dismissed without prejudice. The defendant, on the other hand, argues that this court may dismiss an indictment with prejudice for an isolated, but substantial instance of neglect. In *United States v. Taylor*, the U.S. Supreme Court suggested that, to dismiss an indictment with prejudice, the district court should consider whether the government's conduct constituted "an isolated unwitting violation," or if it evidenced "bad faith" or a "truly neglectful attitude" with respect to the defendant, or if a more general "pattern of neglect" existed. *United States v. Taylor*, 487 U.S. 337, 339 (1988). *See also United States v. Hernandez*, 863 F.2d 239, 244 (2d Cir. 1988) ("[I]n the absence of a factually supported finding of bad faith *or* a pattern of neglect by local United States Attorney, an 'isolated unwitting violation' of the Speedy Trial Act cannot support a decision to dismiss with prejudice.") (citing *Taylor*, 487 U.S. at 339) (emphasis added). Finally, courts may properly take in to account "a demonstrably lackadaisical attitude on the part of the government attorney in

charge of the case." *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993) (citing *United States v. Giambrone*, 920 F.2d 176, 180 (2d Cir. 1990)).

A review of the record in this case reveals that the facts and circumstances leading to the Speedy Trial Act violation are both unfortunate and unsettling. First, the court finds that the telephone call from the U.S. Marshals' Office to AUSA Philips on December 19 or 20, 2007 must have concerned the defendant's impending transfer into federal custody. At that time, an arrest warrant had already been executed and a complaint had been filed. Two detainers had been issued and lodged with Nassau County law enforcement officials. The next logical step was to arraign the defendant after he was taken into federal custody. On December 21, 2007, U.S. Marshals transported the defendant from the Queens facility to this court. The U.S. Marshals also notified the magistrate arraignment clerks. Yet, for reasons still unknown, the defendant was never presented for arraignment and was returned to the Queens facility. AUSA Gatta, who served on arraignment duty on December 21, 2007, stated that never heard of the defendant. As a matter of procedure, the court takes judicial notice of the fact that the U.S. Marshals do not and may not remove a defendant from the courthouse to be lodged in a jail facility without an order of detention, either permanent or temporary, signed by either a magistrate or district judge. No such order was issued here. Yet, the U.S. Marshals took the defendant to the Queens facility, which, in turn, accepted the defendant for lodging. The U.S. Marshals are usually supposed to stay with the defendant until he or she is arraigned at the courthouse. In the rare instance that an arraignment cannot be held at courthouse, the U.S. Marshals must secure a temporary detention order. Here, they apparently returned the defendant to the Queens facility without any such order, asserting that the defendant remained in federal custody, as he was still serving the sentence giving rise to the charge of escape in this case.

Thus, the U.S. Marshals and the BOP also bear some responsibility for the mishandling of the defendant on the date of his intended initial arraignment.

Further, when the U.S. Marshals contacted AUSA Philips a week later on December 26, 2007, she noted the defendant's arrest in Nassau County and asked for the warrant and complaint, which were duly faxed to her, but inexplicably did nothing else. The U.S. Marshals' next communication, the January 7, 2008 faxed letter requesting a status report, was made to the U.S. Attorney's Office while AUSA Philips was on vacation. Despite the staff coverage practices of the U.S Attorney's Office, apparently no action was taken on the faxed letter or on the defendant's case until AUSA Philips returned from vacation a week later. By that time, AUSA Philips had apparently forgotten that the defendant was already in custody, and she retrieved, reviewed, and returned the defendant's file. AUSA Philips believes she made a "status report" via voicemail to Deputy Marshal Gonzalez, but made no further effort to follow up on the matter.

In addition, the record indicates that Queens facility never inquired into the authority or the lack of authority it had to hold the defendant during all of the months of his detention. The documents from the Queens facility contained in Government Exhibit D show that defendant asked when he would be taken to the MDC but no follow up was done by BOP officials. As the government noted during oral argument, there was neglect on "multiple occasions" in this case. Indeed, had any of the authorities performed their duties fully or intervened more actively in this case, the oversights of the others might have been remedied. Instead, the neglect and omissions compounded.

Finally, on April 7, 2008, the defendant wrote a letter to Chief Judge Dearie seeking clarification of his status. Chief Judge Dearie notified AUSA Philips of the defendant's letter on April 14. The defendant was arraigned on April 16, after 119 days in federal custody.

In assessing the facts and circumstances which led to the Speedy Trial Act violation, the court is not limited to scrutinizing the government's conduct alone. Courts also consider the defendant's actions, especially the failure to appear or other acts that might contribute to a delay in criminal proceedings. *See Taylor*, 487 U.S. 326, 342 (finding defendant's flight is certainly one of the circumstances of the case which led to dismissal). In this case, the defendant, having been transferred from state to federal custody for prosecution on the complaint, played no role in causing or prolonging the Speedy Trial Act violation. If anything, it was his desperate, handwritten letter, which finally drew attention to his plight and alerted the government to this problem.

Both the defendant and the government agree that there was no bad faith behind the government's conduct in violating the Speedy Trial Act. The government states that, in the five years that AUSA Philips has been the Chief of Intake, it is aware of no other case where a defendant returned on arrest warrants has experienced similar delays in arraignment. The government also argues that the delays in the defendant's prosecution did not stem from a pattern of neglect. The court agrees. Based upon the facts set forth above, the court finds that the defendant's case is an example of an unintentional isolated violation. The U.S. Attorney's Office was simply careless in the handling of this particular case. The defendant's case also demonstrates a lack of diligence by the U.S. Marshals, as well as the Queens facility and the magistrate arraignment clerks. The combined lack of due diligence and lack of ownership exhibited by each entity, resulted in a failure of the criminal justice process that, if not for the

defendant's own actions, essentially would have left him indefinitely detained incommunicado for months without any legal recourse. Though the court is greatly troubled by this combination of failures, the fact remains that only one Speedy Trial Act violation occurred. Further, there has been no allegation that a pattern of Speedy Trial Act violations have occurred within the United States Attorney's Office in the Eastern District during this or any other time period. *See United States v. Giambrone*, 920 F.2d 176, 182 (2d Cir. 1990) (finding a pattern of neglect existed after confronting a number of Speedy Trial Act related cases emanating from the United States Attorney's Office in the Western District of New York).

The absence of bad faith or of a pattern of neglect by the government in other cases does not prevent a court from finding a "truly neglectful" or "lackadaisical" attitude by the government in this case. While the record demonstrates that that both the U.S. Attorney's Office and the U.S. Marshals corresponded regarding the status of the defendant after his expected arraignment date, it was a lack of follow up by both entities, but in particular by the U.S. Attorney's office, that created the problem here. The U.S. Marshals did not follow up further based on the obviously erroneous response by AUSA Philips. The burden did not fall entirely on AUSA Philips, however, because the fax from the U.S. Marshals sent on January 7, 2008 was apparently ignored by her colleagues who were covering for her while she was on vacation. It appears that there was a somewhat lackadaisical attitude by the prosecutor's office from the time that the defendant was initially brought to the courthouse to the time the U.S. Marshals made their final inquiry and the case was put in a dormant status.

However, once AUSA Philips received a call from Chief Judge Dearie on April 14, 2008, notifying her of the defendant's situation, she retrieved the defendant's case file and requested that the U.S. Marshals produce the defendant in arraignment court on April 16, 2008. AUSA

Philips personally appeared at the defendant's arraignment that day. Moreover, since then, steps have been taken by the U.S. Attorney's office to ensure that a situation like this does not occur again. The court further notes in this regard that the U.S. Marshals have also reviewed and adjusted their procedures to avoid a similar situation in the future. These remedial actions support a finding that this was an isolated incident of neglect which weighs in favor of dismissal without prejudice.

> C. **Impact on the Administration of the Speedy Trial Act and Prejudice to the Defendant**

The Speedy Trial Act mandates that a defendant be brought to trial within 100 days from the time of his arrest. 18 U.S.C. §§ 3161(b) & (c)(1). The government has thirty days to indict a defendant after arrest and an additional seventy days to commence a trial against a defendant after indictment. 18 U.S.C. § 3161(b). The Act serves two major purposes: to protect the defendant from undue delay in his trial and to benefit society by quickly resolving criminal cases. *United States v. Breen*, 243 F.3d 591, 594 (2d Cir. 2001) (citing *United States v. Kelly*, 45 F.3d 45, 47 (2d Cir. 1995)).

In this case, the 145-day delay in indictment exceeds the entire time limitation set forth in the Act. Time can be excluded pursuant to 18 U.S.C. § 3161(h) based on findings by the court or consent of the parties. The government argues that the return of an escaped prisoner to custody does not trigger the start of the Speedy Trial Clock, because the escapee still owes the government time on the previous sentence. *See United States v. Grant*, 433 F. Supp. 1113, 1114-15 (S.D.N.Y. 1977)(Four months served between recapture of a federal escapee and his indictment on escape charges constituted time served on defendant's original sentence.); *United States v. Zukowski*, 851 F.2d 174, 177 (7th Cir. 1988)(Apprehension of a federal escapee served as a continuation of his prior sentence and not trigger the Speedy Trial Act.).

14

In *Grant*, the defendant had served just two months on a thirty-six month sentence when he escaped federal custody during a supervised furlough. 433 F. Supp. at 1114. Authorities recaptured the defendant and returned him to his original federal prison. *Id*. Once recaptured, over three months passed before a federal grand jury indicted him for his escape offense. *Id*. The court found that "the rights of an accused to a prompt hearing before a magistrate, to be informed of the nature of the offense and to the effective assistance of counsel, do not apply to an escapee already in legal custody" *Id.* (citing *Keaveny v. United States*, 405 F.2d 821 (5th Cir. 1969)). Those safeguards, which are designed to protect the presumption of innocence, are not needed where an escapee "was merely returned to the lawful custody of the Attorney General to complete the period of incarceration pursuant to a prior judgment and commitment." *Id.* (citing *Mulligan v. United States* 252 F.2d 398 (5th Cir. 1958)). In sum, the court held that the return of an escapee to custody should be considered to be a continuation of time that the prisoner was supposed to serve. *Id*. at 1115.

Even if this court adopted such a view and considered the Speedy Trial Act to be triggered after the defendant served the remaining sixty days of his previous sentence, the pre-indictment delay still exceed the thirty-day requirement by fifty-five days. "[T]he length of the delay is necessarily a measure of the seriousness of the speedy trial violation." *Hernandez*, 863 F.2d at 243. Given the relatively simple and straightforward nature of the charge against the defendant, a delay of almost two months in indicting him is both undue in length and serious in nature. Moreover, the delay was ended in large part due to the defendant's own conduct. It is possible that, had he not written the letter to Chief Judge Dearie, he would have been held indefinitely. The fact that he had not completed serving time on his prior sentence does not justify the government's delay in arraigning and indicting him.

As for prejudice to the defendant by the delayed indictment, there is a presumption that "[t]he longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty, for whether he is free on bail or not, . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Giambrone*, 920 F.2d 176, 180-81 (2d Cir. 1990)(citing *Taylor*, 487 U.S. at 340) (internal quotation marks omitted). The government argues that, if the indictment is dismissed without prejudice, the defendant's case will not be prejudiced because he still retains any and all defenses that were at his disposal within thirty days of his entry into federal custody on December 20, 2007. The defendant's counsel does not dispute the lack of any tactical prejudice to his client, but urges the court to presume the innocence of his client, as it must. Despite the lack of actual tactical prejudice to the defendant, the court is mindful of the restrictions to the defendant's liberty and the anxiety created in him as a result of the delayed indictment in this case. Thus, whatever advantage the government might have derived by the lack of actual prejudice is outweighed by the presumed suffering and disruption that the delay and detention caused the defendant and the erosion of public confidence in the criminal justice process that such delay has caused. This prong weighs in favor of dismissal with prejudice.

D.     **Impact on the Administration of Justice**

Finally, the court must consider how a dismissal with or without prejudice would impact the administration of justice. The government suggests that dismissal without prejudice would deter inmates from escaping prison and implies that dismissal with prejudice would weaken this deterrence. This reasoning is flawed, in part, because inmates planning to escape cannot know ahead of time that upon their recapture, the government may violate the Speedy Trial Act and

16

cause the escape charge to be dismissed. Fugitives should expect that the law will catch them, regardless of what type of dismissal is granted here. Nevertheless, the defendant here should be held accountable for the acts he is alleged to have committed. The defendant's violation of the terms of supervised release on two prior occasions, his previous violation of state-imposed probation and state court bench warrants, as well as the acts leading to his arrest and conviction in Nassau County, demonstrate his complete disregard for the rule of law. Thus, the court finds that the goals of specific and general deterrence would be furthered if dismissal were granted without prejudice, because the defendant would be held accountable for the alleged crime and society would be reminded that courts will not tolerate an act of escape.

A court may take into account the government's truly neglectful or demonstrably lackadaisical attitude not only in consideration of the facts and circumstances leading to the dismissal, but also in evaluating the impact of reprosecution on the administration of justice. *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993) (citing *Giambrone*, 920 F.2d at 180)). As previously noted, while the court found a somewhat lackadaisical attitude on the part of the government in its initial handling of this case, there is no proof of a pattern of such conduct. Indeed, the government has taken affirmative steps to insure that such a situation does not recur.

Thus, the unusual injustice occasioned upon the defendant is counterbalanced by the ability to bring the defendant to trial on the serious charge he is alleged to have committed. In further considering this decision's impact on the administration of justice, the court finds that dismissing the case without prejudice to allow the government to re-indict the defendant would serve as a sufficient sanction against the government's violation of the defendant's speedy trial right, as well as an adequate deterrence against future violations. *Hernandez*, 863 F.2d at 244 ("[D]ismissal without prejudice is not a toothless sanction.") (citing *Taylor*, 487 U.S. at

342)(internal quotation marks omitted). This factor weighs in favor of dismissing the indictment without prejudice.

## CONCLUSION

After carefully considering and weighing the factors cited in 18 U.S.C. § 3162(a)(1), the court finds the serious nature of the underlying charge, the facts and circumstances of the government's isolated, albeit careless behavior, and the beneficial impact on the administration of the justice served by dismissal of the indictment without prejudice, outweigh any prejudice suffered by the defendant, and any negative impact reprosecution may have on the administration of the Speedy Trial Act. It would be unjust to permit the defendant to avoid prosecution under these circumstances. While the government bears responsibility for a Speedy Trial Act violation, the court believes that this violation "may be adequately redressed by requiring the government to seek another indictment." *Wilson*, 11 F.3d at 353. Accordingly, the court grants the defendant's motion, in part, by dismissing the indictment and denies it, in part, as the dismissal of the indictment is without prejudice.

SO ORDERED.

Dated: Brooklyn, New York
July 13, 2009

_____/s/_____
DORA L. IRIZARRY
United States District Judge